IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER ROGERS, RICHARD | § | |
| BENAVIDES, BLAKE TAYLOR, | § | |
| BRIAN BRINCKS, RENE CAVAZOS, | § | |
| JUVENTINO MONTELLANO, JASON | § | |
| CAVAZOS, LINDELL COPELAND, | § | |
| RUDY MERCADO, RICHARD SMITH, | § | |
| LAWRENCE GARCIA, ANTHONY | § | |
| SHANE PALMER, PHILLIP | § | |
| SAMPSON, CLAYTON REED, JAMES | § | |
| GRAY, CORY MCALISTER, | § | |
| TOMMY JENNINGS, and LARRY PINA | § | |
| | § | CIVIL ACTION NO. 1:17-cv-457-ADA |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| BRENT STROMAN, MANUEL | § | |
| CHAVEZ, ABELINO "ABEL" | § | |
| REYNA, CITY OF WACO, TEXAS, | § | |
| MCLENNAN COUNTY, TEXAS, ROBERT | § | |
| LANNING, JEFFREY ROGERS, PATRICK | § | |
| SWANTON, STEVEN SCHWARTZ, | § | |
| and CHRISTOPHER FROST, | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFFS' OMNIBUS SUR-REPLY TO ALL DEFENDANTS' REPLIES IN
SUPPORT OF THEIR MOTIONS TO DISMISS**

## I.      Introduction.

The County and City Defendants have submitted nearly 120 combined pages of briefing in an attempt to deny Plaintiffs an opportunity to even begin to prove their cases.  Much of their argument is erroneous in that it misconstrues the law, mischaracterizes Plaintiffs' position, employs tortured logic, or otherwise tries to distract the Court from the fact that, at base, law enforcement arrested Plaintiffs with fill-in-the-name template affidavits that failed to state a single, true, non-conclusory fact about Plaintiffs themselves.

## II.     City and County Defendants Continue to Ignore the 12(b)(6) Pleading Standard.

Despite the voluminous briefing and wide range of substantive legal issues in play, it bears repeating that this is a motion to dismiss, where the only question is whether Plaintiffs' well-pleaded allegations, taken as true, state a plausible claim for relief.[1]  The City and County improperly attempt to reframe the facts as they wish them to be, rather than accept Plaintiffs' version.  For example, both the City's and County's entire arguments rest on the alleged "fact" (also stated in the template affidavit) that Plaintiffs were present while "wearing common identifying, distinctive signs or symbols."  **This is not a FACT.**  It is a naked recitation of text from Chapter 71, and therefore conclusory.  Never once , in the affidavit or anywhere else, do Defendants identify *what* the "signs or symbols" were, whether it was one symbol common to everyone or more than one, what exactly the "commonality" was, what they supposedly "identified" or how they identified it, or anything else about these "signs or symbols."  The statement in the affidavit could just as easily refer to people wearing the same brand of shoes, or Texas Longhorns paraphernalia, or the color black, as it could refer to some alleged indicators of gang affiliation.  Without any factual support, it is devoid of meaning and cannot support a

---

[1] *Ashcroft v. Iqbal*, 556 U.S. 662, 677–78 (2009).

reasonable belief in probable cause.  This is especially so considering the Defendants' nonsensical interpretation of Chapter 71's definition of "criminal street gang," discussed below.

## III.      "Pay No Attention to the Man Behind the Curtain!"

The City and County Defendants engage in all manner of legal acrobatics to distract from the truth that law enforcement possessed *no facts* supporting a belief that each Plaintiff had previously made an agreement that one or more of the motorcyclists attending the conference would commit aggravated assault, murder, or capital murder at Twin Peaks on May 17, 2015.

### A.      The City and County Defendants attempt to cherry-pick a few "facts" and call them the "totality of the circumstances."

The City continues to rely on the "definition" it advanced in its Motion of the "totality of the circumstances."[2]  After assigning this very specific (and woefully incomplete) definition to the term, the City repeats throughout its Reply that the decisions of the individual Defendants were reasonable based on *this* "Totality of the Circumstances."   Redefining the "Totality of the Circumstances" in such a way is an egregious misstatement.  First, it is plainly *not* the "Totality" of the circumstances facing law enforcement at Twin Peaks, especially as pleaded.  Most especially, the City has intentionally ignored material evidence that cuts against any theory of pre-planned violence, such as the fact that Plaintiffs ran away from the violence and ducked for cover. The County identically argues that Plaintiffs' allegations that they ran away from the violence or ducked for cover "do not invalidate probable cause for the offense of EIOCA."[3]

This simply ignores the probable cause framework set out by the Supreme Court in *Illinois v. Gates*.[4]  The question is whether law enforcement could have believed, at the time of the arrests

---

[2] *See* City Ds.' Motion to Dismiss at 6; City Ds.' Reply at 19.
[3] County Ds.' Reply at 19.  Interestingly, the City seems to have abandoned its baseless argument, made in Replies in related cases, that these facts "are irrelevant and should not be considered for any purpose."  *See, e.g.,* City Ds.' Reply at 2, *Rhoten et al. v. Stroman et al.*, NO. 1:16-CV-00648.
[4] *Illinois v. Gates*, 462 U. S. 213, 238 (1983).

and considering the *totality of the circumstances* before them, that Plaintiffs had committed a crime—namely, the crime of conspiring to commit aggravated assault, murder, or capital murder. The only semblance of a "plan" offered by the City and County is that Plaintiffs showed up for the purpose of "supporting" (or displaying a "show of force" for) either the Bandidos or the Cossacks.[5] Merely showing up is obviously not the same thing as an agreement for one of them to commit murder, but in any event, evidence that Plaintiffs (indeed, evidence that *nearly everyone there*) ran away from the violence and ducked for cover is very strong evidence *against* an inference that the motorcyclists came to Waco *with an intent* to make a "show of force," or "support" the violence in any way.   Similarly, Defendants' theory relies on a "proliferation of weapons," but ignores the fact, as alleged by Plaintiffs, that many of these weapons were found safely stowed away.[6]   Cherry-picking facts and calling them the "Totality of the Circumstances" is not only false but completely counter to the mandate of *Gates*.

**B.   Misrepresentations of Plaintiffs' allegations.**

The misdirection described above is compounded by the fact that the County, in particular, has misrepresented statements from Plaintiffs' Complaint.  Namely, citing the live Complaint, the County asserts that "Plaintiffs admitted . . . (2) that they were wearing various patches, jackets, vests, and t-shirts **that reflected motorcycle club affiliation or support for the Cossacks or Bandidos;** [and] (3) that **tension existed between the Cossacks, Bandidos, and their support clubs** before May 17, 2015."[7]  This is demonstrably <u>false</u>.  What Plaintiffs actually said regarding their clothing was, "All clothing worn by Plaintiffs on May 17, 2015, including jackets, vests, t-

---

[5] *E.g.*, County Ds.' Reply at 4–5; City Ds.' Reply at 19.
[6] Pls.' First Amended Complaint at ¶ 121.
[7] County Ds.' Reply at 4–5 (emphasis added).

shirts, and patches, was completely lawful."[8]  The County has brazenly added extra words to what actually appeared in Plaintiffs' Complaint.   Because nothing in the Complaint supports Defendants' theory of an agreement or plan to commit murder or assault, the County presumably added "reflected affiliation or support" in an effort to bolster its conspiracy theory.  Regarding any pre-existing "tension," what Plaintiffs identified was "friction between **some members** of the Bandidos . . . and **some members** of the Cossacks Motorcycle Club ("Cossacks")."[9]  There is a world of difference between "some members" knowing about tension between the clubs and <u>all</u> members knowing; furthermore, not only did Plaintiffs not admit that so-called "support clubs" knew anything about any tension, but the phrase "support club" does not even appear in the Complaint, nor has it ever been defined.  As such it is, for the purpose of these Motions to Dismiss, a meaningless phrase thrown around by Defendants in a subtle attempt to propagate their theory of a grand conspiracy.

In fact, the Complaint clearly alleges that "<u>no Plaintiff herein had prior knowledge that any member of the Cossacks motorcycle club would be present at the COC meeting.</u>"[10]  This is a very significant fact.  It completely undermines any notion of a conspiracy by these Plaintiffs, yet Defendants ignore it as if it were never plead.

## C.   Defendants' reading of Chapter 71 of the penal code defies common sense.

The City and County Defendants make numerous unsupportable, illogical assertions about how Chapter 71 works.  Why?  Because the Defendants are aware that everyone knows what a "conspiracy to commit aggravated assault or murder" is, and that it requires evidence of a **plan** to commit aggravated assault or murder AND an **agreement** to do so by *each* conspirator.  And they

---

[8] Pls.' First Amended Complaint at ¶ 213.
[9] *Id.* at ¶ 38 (emphasis added).
[10] *Id.* at ¶ 218.

know that mere presence and the nebulous, conclusory assertion of "common identifying signs or symbols," especially in the face of observed exculpatory conduct such as running away and ducking for cover, *is not even close to enough evidence*. So, Defendants engage in all manner of statutory sleight-of-hand to convince everyone that some kind of voodoo hidden within the text of Chapter 71 means they don't need evidence of a plan or an agreement. But the text of Chapter 71 regarding conspiracies is identical to the regular ol' conspiracy language in Chapter 15. That's right: even under Chapter 71, law enforcement needs the *same evidence* of a *plan* and an *agreement* that they always needed in a vanilla conspiracy. Let us examine some of the ways in which the City and County Defendants misapply Chapter 71.

**1.  Defendants artificially expand the definition of "criminal street gang."**

The City Defendants assert,

> Under the Penal Code definition of a criminal street gang, it is sufficient that law enforcement had probable cause to believe that members and associates of the Bandidos **include** three or more persons having a common identifying sign or symbol who continuously or regularly associate in the commission of criminal activities.[11]

This is wrong. By adding the word "include," the City Defendants drastically alter the definition by suggesting that *only three* of the people in question must "continuously or regularly associate in the commission of criminal activities." It further suggests that anyone but those three does not need to even be *aware* of the ongoing criminal activity. Compare this to the real definition: "'Criminal street gang' means three or more persons having a common identifying sign or symbol or an identifiable leadership who continuously or regularly associate in the commission of criminal activities."[12] This clearly requires *everyone* in the criminal street gang to continuously or regularly associate in crimes. Furthermore, the City's definition would allow absurd hypothetical situations.

---

[11] City Ds.' Reply at 23 (emphasis added).
[12] TEX. PENAL CODE § 71.01(d).

For instance, if three members of the Dallas Cowboys operated an illegal gambling ring—they have an identifiable leadership and a common identifying symbol—*the entire team* would be members of a criminal street gang, even though they did not participate in the illegal gambling and were *completely unaware of it*. Indeed, *anyone* wearing something with the Cowboys' silver star on it would be a criminal street gang member under Defendants' definition, and could be arrested with probable cause if they are present at AT&T Stadium when a fight breaks out between a few Cowboys fans and Eagles fans. It should be noted that the City cites to no case law to support this bizarre interpretation.

**2.     It is either incompetence or a knowing violation of the law to assert that simply meeting the definition of a criminal street gang member—*without anything more*—constitutes probable cause to arrest.**

This issue goes straight to the heart of this lawsuit. The County repeatedly argues, "all persons at Twin Peaks who fit the arrest criteria could be believed to have violated the law simply by being present with the group, whether or not they committed any acts of violence."[13] The City Defendants echo this argument.[14] Not only was the "arrest criteria" nothing more than wearing *anything* that could somehow be remotely connected to either the Bandidos or the Cossacks— which is already insufficient to satisfy the statutory requirements of membership in a criminal street gang— but also it is clear that Defendants are attempting to re-write Chapter 71 to make alleged membership in a criminal street gang *a crime in and of itself*, without *any evidence* of a conspiracy or agreement. The fact that a motorcyclist showed up at Twin Peaks wearing a certain color or a patch is not evidence of a plan or an agreement to commit murder. This is the exact

---

[13] County Ds.' Reply at 13.
[14] *E.g.*, City Ds.' Reply at 18.

mistake that created this whole ugly mess, and the Defendants continue to maintain this false premise.

Put another way, the Defendants argue that all the elements of a conspiracy to commit murder could be inferred from mere presence and perhaps some undescribed "common identifying sign or symbol."[15]  For this proposition they cite to *Rojas v. State*.[16]  For the record, Plaintiffs do not contend, as both the City and County Defendants impliedly accuse them of, that a conspiracy can only be inferred from direct participation in the violence.[17]  In any event, *Rojas* illustrates how the Defendants have gone too far with their theory.  In *Rojas*, the court found that "[a]lthough the others actually did the burglarizing, [Rojas] suggested places to hit, indicated the kind of property to take, bought stolen property, and re-sold some of the stolen property."[18]  While it is true that Rojas did not take part in the burglary itself, he clearly participated and was an essential member of the criminal enterprise in the numerous ways outlined by the court.  This case in no way supports the position urged by the Defendants that mere presence along with wearing a vest or patch can establish probable cause for a conspiracy to commit aggravated assault or murder.

## IV.   "Clearly Established Law"

### A.   All Defendants have failed to respond at all to Plaintiffs' argument that, in *Malley* and *Franks* cases, the only clearly-established-law analysis is of the *Malley* or *Franks* violation itself.

The City and County Defendants attempt to define the "clearly established" question in a completely different way than the Fifth Circuit has done in *Malley* and *Franks* cases.  Specifically, they suggest that the Court should engage in an analysis of whether probable cause must be

---

[15] County Ds.′ Reply at 13.
[16] *Rojas v. State*, 693 S.W.2d 605 (Tex. App.—San Antonio 1985, pet. refused); *see* City Ds.′ Reply at 18.
[17] City Ds.' Reply at 18; County Ds.' Reply at 13.
[18] *Rojas*, 693 S.W.2d at 612.

particularized in group arrest cases *and* they dispute that Plaintiffs have identified a similar-enough case to have put law enforcement on notice that arresting Plaintiffs without individualized probable cause was unlawful.  However, as stated by Plaintiffs in their Response, recent Fifth Circuit precedent demonstrates that such an exercise is not necessary.  In cases involving warrants, the conduct in question is the violation of either *Malley* or *Franks*.  Because the principles of both *Malley* and *Franks* have been clearly established for decades, law enforcement has been put on notice of the unlawfulness of submitting such faulty warrants.[19]  Plaintiffs' position <u>directly contradicts</u> the assertions regarding the applicable "clearly established law" analysis urged by the City and County Defendants in their Motions to Dismiss, yet <u>neither even attempt to rebut Plaintiffs' arguments</u>, likely because the Fifth Circuit is so clear on  this issue.  For these reasons, the Court should not give Defendants a second bite at the qualified-immunity apple, as it were, by also applying "clearly established law" analysis to the circumstances of the underlying false arrest.

**B.    Even under Defendants' improper framing of the "clearly established" question, Plaintiffs have pointed to case law establishing Defendants' conduct as unlawful.**

The City and County still contend that Plaintiffs have not identified cases in which the alleged violations were clearly established.  Notwithstanding the error of Defendants' analysis (see Section A above), in addition to cases previously cited by Plaintiffs, two further Fifth Circuit cases show that arresting groups of suspects without probable cause was established to be unlawful at the time of the Twin Peaks arrests.

In *Williams v. Kaufman County*, 40 officers descended on a nightclub with warrants to search the property and arrest five individuals suspected of dealing cocaine.[20]   The police, however, proceeded to "secure the outer perimeter of the search area, which included the Club's

---

[19] *See* Pls.' Omnibus Response § II.D.2.
[20] *Williams v. Kaufman County*, 352 F.3d 994, 999–1000 (5th Cir. 2003).

building and parking lot, and the entire city block up to the roadway. . . . The police detained approximately 100 people, including plaintiffs, inside the Club for about three hours. During that time, officers conducted a pat-down search, strip search, and warrants check on each individual there."[21]  The court relied heavily on *Ybarra* in its clearly-established-law analysis, finding that "Even accepting that there were aspects of this warrant's search that made it  . . . more likely that multiple persons would be in possession of drugs, none of these extenuating circumstances created probable cause or reasonable suspicion 'particularized with respect to [plaintiffs].'"[22]

The Fifth Circuit also recognized the need for individualized probable cause in *Club Retro LLC v. Hilton*.  In that case, a SWAT team raided a nightclub, detaining the patrons and staff there for more than an hour and searching everyone.[23]  The Fifth Circuit relied primarily on *Terry v. Ohio*[24] in finding that conducting a mass search without "specific and articulable facts that reasonably warrant the inference that a particular person is committing a crime" was clearly established to be unlawful.[25]

Finally, in *Ratliff v. City of Houston* (a case cited by the City for a different proposition), the court relied on *Pringle* and *Barham v. Ramsey* in observing, "It is unconstitutional to engage in mass arrests without probable cause **as to each individual**."[26]

These cases, along with those cited by Plaintiffs in their Response, would have put law enforcement on notice that arresting nearly all the motorcyclists at Twin Peaks without individualized probable cause was unlawful.

---

[21] *Id.* at 1000.
[22] *Id.* at 1006 (citing *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979)).
[23] *Club Retro LLC v. Hilton*, 568 F.3d 181, 200–01 (5th Cir. 2009).
[24] *Terry v. Ohio*, 392 U.S. 1 (1968).
[25] *Club Retro*, 568 F.3d at 209–210 (internal quotations omitted).
[26] *Ratliff v. City of Houston*, 2005 U.S. Dist. LEXIS 39410 *71 (S.D. Tex. July 25, 2005).

C.    **Defendants' misstatements regarding the "protest cases."**

Defendants make several incorrect statements about the protest cases.  First, the County argues inexplicably claims that protest cases cited by Plaintiffs (*Dinler*, *Barham*, and *Papineau*) do not contain "sufficient factual similarity to the case at bar,"[27] while somehow *Carr* (a protest case cited by Defendants) is "*directly* on point."[28]  To clarify Plaintiffs' position, *Dinler*, *Barham*, and *Papineau* (and indeed, *Carr* and *Bernini*) are part of a robust consensus of law agreeing that particularized probable cause is always necessary, even in cases involving a group of people.  What distinguishes *Carr* and *Bernini* from the others is that based on the facts in those cases, the courts were able to find particularized probable cause because the *entire group was observed acting as a cohesive unit committing crimes*.[29]  This is a narrow and highly fact-specific finding, which does not resemble the case at bar.  Namely, the motorcyclists at Twin Peaks were demonstrably *not* acting as a cohesive unit, exemplified by the fact that most of them ducked and ran for cover when the fighting started.  Indeed, in *Bernini*, law enforcement went out of its way to separate people they believed to have joined the crowd *after* it had been observed breaking the law as a cohesive unit.[30]  Reyna and the County simply ignore what is alleged by Plaintiffs and ask the Court to accept their construction of what they would like the facts to be.

Furthermore, the County misstates the holding from these cases, suggesting that one need only be able to "connect" an individual to the group.[31]  This is incorrect under *Bernini* and *Carr*,

---

[27] County Ds.' Reply at 9.
[28] *Id.* at 11 (emphasis in original).  In fact, the City Defendants have previously argued that "protest cases . . . are not similar to what was faced by officers at Twin Peaks."  *E.g.,* City Ds.' Reply at 18, *Rhoten et al. v. Stroman et al.*, NO. 1:16-CV-00648.
[29] *Bernini v. City of St. Paul*, 665 F.3d 997, 1003–04 (8th Cir. 2012); *Carr v. District of Columbia*, 587 F.3d 401, 404–05 (D.C. Cir. 2009).
[30] Pls.' Resp. at § II.D.4.a.iv.
[31] County Ds.' Reply at 13.

in which the arrestees were all observed *within* the group and *acting as a cohesive unit*.[32]

## V.    "Gotcha! We Win!"

The City and County Defendants assert a variety of "gotcha" arguments in their attempt to escape liability.

### A.    Plaintiffs have not waived any arguments.

The County Defendants open their brief with an argument that Plaintiffs have "conceded" several arguments, including Reyna's argument that "Reyna did not have the authority to arrest anyone or to cause the arrest of anyone."[33]   This nonsense began with a frivolous argument advanced by Reyna that barely warranted a response in the first place; nonetheless, contrary to the County's assertion, Plaintiffs did respond.[34]   In short, Reyna was without doubt a moving force behind Plaintiffs' false arrests.   It could not be more clearly stated in Plaintiffs' Complaint or in their Response to the 12(b)(6) Motions.   The suggestion that Plaintiffs have conceded this argument is not worthy of further response.

The County also argues that Plaintiffs have waived First Amendment and excessive bail claims by not responding to the arguments in their Motion to Dismiss.[35]   To the contrary, Plaintiffs never pleaded these claims; rather, the $1,000,000 bail and intrusions on Plaintiffs' right to free association were mentioned in relation to damages caused by Defendants in connection with their false arrests and wrongful incarceration.   As such, Plaintiffs have not "waived" anything at the dismissal stage, and retain the right to plead such claims specifically at a later date, if necessary.

---

[32] *Bernini*, 665 F.3d at 1003–04; *Carr*, 587 F.3d at 404–05.
[33] County Ds.' Reply at 2.
[34] *See* Pls.' Resp. § II.C.4.A.
[35] County Ds.' Reply at 3.

**B.** **There are no "new" causes of action in Plaintiffs' Response.**

Both the City and County assert that Plaintiffs state "new" claims for bystander and/or supervisor liability in their Response.  To the extent that Defendants claim Plaintiffs must have pleaded the "magic words" of "supervisor" or "bystander" in the Complaint, this is simply not true, as Plaintiffs explained in their Response.[36]  Plaintiffs have plead sufficient facts to put Defendants on notice of both of these claims and the elements of each claim.  If the Court deems Plaintiffs' Complaint to have insufficiently alleged these claims by name, Plaintiffs could easily amend.

**C.** **Reyna is not absolutely immune from liability.**

It should be noted that Reyna has previously conceded in legal documents filed in his defense in several Twin Peaks civil cases that he was not contending that he is entitled to absolute prosecutorial immunity from his alleged involvement in the investigative phase of the Twin Peaks criminal cases.[37] Further, he made no such claim of absolute immunity in his Motion to Dismiss in this case.  Nonetheless, Reyna has suddenly asserted a claim for absolute immunity in his Reply. Now that Plaintiffs have filed their Response, Reyna attempts to resurrect the absolute immunity defense, allegedly because "Plaintiffs' new assertion [that Reyna was acting in his capacity as McLennan County DA] . . . opens the door for Reyna's entitlement to absolute prosecutorial immunity."  This is incorrect, as discussed below.  However, in what cannot be pure coincidence, Reyna similarly dragged this argument out of the recycling bin in his Replies in every other related Twin Peaks case, including those in which no such argument about his role as a District Attorney is even advanced.  In those cases, Reyna gives no reason for his renewed assertion of this

---

[36] Pls.' Resp at § II.C.4.b.  Although this argument was made specifically in relation to supervisory liability, it applies with equal force to a bystander liability claim.

[37] *E.g.*, *see Vensel v. Sroman et al.*, Case No. 1:15-cv-01045-ADA, Document 41 at page 5.

abandoned argument, but clearly, Reyna is trying to spring a trap based on reasoning that is disingenuous at best.[38]

In any event, this argument holds no water. Reyna and the County take a very black-and-white view of Reyna's role in an attempt to suggest that no matter how it is sliced, either Reyna or the County is off the hook. On the one hand, they say, if he was acting as a District Attorney, he is absolutely immune from suit.[39] On the other, if he was acting as a police officer, he was not the final policymaker and thus McLennan County cannot be liable.[40]

Plaintiffs do not contend that Reyna actually became a police officer. The fact that, as Plaintiffs allege, he took on investigative responsibilities normally performed by the police does not mean he suddenly became something other than the elected District Attorney of McLennan County. This was made clear in their Response.[41] Clearly, a District Attorney has many duties, and is legally authorized to perform many tasks, including investigation. However, not *all* of those tasks are subject to absolute immunity, as the Supreme Court has repeatedly made clear.[42] Plaintiffs allege that Reyna *inserted himself into the investigation* and changed its course. Plaintiffs allege throughout their Complaint that Reyna made the determination that probable cause existed to arrest anyone who met certain "criteria." He then decided on the "criteria." He conspired with Chief Stroman and others in orchestrating the gathering of data to see which bikers (as it turned out, nearly all of them) would be arrested. All of this conduct is (a) fully authorized

---

[38] *See Thomas Paul Landers v. Stroman, et al.*, No. 1:16-CV-01153, Doc. 30 at 3; *Gilbert Zamora v. Reyna et al.*, No. 1:17-CV-00469, Doc. 34 at 3–4; *William Brent Redding v. Stroman, et al.*, No. 1:16-CV-01154, Doc. 28 at 3–4; *Yager v. Stroman, et al.*, No. 1:17-CV-00217, Doc. 25 at 3–4; *Steven Walker v. Stroman, et al.*, No. 1:17-CV-00372, Doc. 43 at 3–4.

[39] County Ds.' Reply at 3–4.

[40] County Ds.' Reply at 23.

[41] Pls.' Resp. at § II.I.3.

[42] *E.g.*, *Burns v. Reed*, 500 U.S. 478, 492–96 (1991) (holding that a prosecutor was not absolutely immune from suit for his advice to police that they had probable cause to arrest the plaintiff).

as a function of the District Attorney's office and (b) decidedly *not* "intimately associated with the judicial process," the keystone of absolute immunity as described by the Supreme Court in *Imbler v. Pachtman* and *Burns v. Reed*.[43]

The County also tries to analogize between the current situation and the facts in *Kalina v. Fletcher*.[44]  The Supreme Court in *Van de Kamp v. Goldstein* has clarified the difference between the conduct at issue in *Burns* and that in *Kalina v. Fletcher*:

> In the years since *Imbler*, we have held that absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding, *Burns*, *supra*, at 492, or appears in court to present evidence in support of a search warrant application, *Kalina*, *supra*, at 126. We have held that **absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation**, *see Burns*, *supra*, at 496.[45]

The difference is clear: in *Kalina*, the prosecutor presented evidence *in court* in support of a search warrant, whereas the prosecutor in *Burns* was acting as part of an investigation and not performing any acts "intimately associated with the judicial process."   Reyna was clearly working in the investigative phase, and therefore is not absolutely immune.[46]  *See also Loupe v. O'Bannon*, 824 F.3d 534 (5th Cir. 2016).

The County further argues in a footnote that should Reyna be found to be absolutely immune, it cannot be held liable for his constitutional violation either.[47]  For this it relies on *City of Los Angeles v. Heller*.[48]  This is absolutely incorrect.  *Heller* did not involve any kind of

---

[43] *Hoog-Watson v. Guadalupe County*, 591 F.3d 431, 438 (5th Cir. 2009) (citing *Burns*, 500 U.S. at 486; *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976)).

[44] *Kalina v. Fletcher*, 522 U.S. 118 (1997).

[45] *Van de Kamp v. Goldstein*, 555 U.S. 335, 343 (2009)

[46] Reyna's conduct was also like the prosecutor in *Hoog-Watson*, who did not receive absolute immunity after she "entered and inspected Hoog-Watson's property, participated in the decision to execute the seizure by rendering legal advice, planned the conduct of the seizure, and participated in the physical act of removing animals." *Hoog-Watson v. Guadalupe County*, 591 F.3d 431 (5th Cir. 2009).

[47] County Ds.' Reply at 4 n.15.

[48] *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986).

immunity, absolute or otherwise.[49]  Rather, the Court held that a municipality could not be liable when a jury had found that *no constitutional harm had occurred*.[50]  That holding makes good common sense, and is clearly inapplicable to a hypothetical situation in which Reyna did in fact violate Plaintiffs' rights, but is found to be absolutely immune from personal liability.  Moreover, the Supreme Court has expressly held (and the Fifth Circuit has acknowledged) that absolute immunity *has no bearing whatsoever* on the question of municipal liability: "municipalities do not enjoy immunity from suit – either absolute or qualified – under § 1983."[51]

**D.     The independent intermediary doctrine.**

**1.     Defendants misstate the standard.**

The City and County Defendants argue for the first time in their Replies that Plaintiffs must plead that each Defendant *individually and personally* "tainted" the grand jury proceedings.[52]  The City further argues for the first time that this had to have been done with malicious intent.[53]  *Not a single case in the Fifth Circuit* applies the independent intermediary doctrine in the manner suggested by the Defendants.  The City and County are simply grasping at straws because Fifth Circuit law so clearly precludes dismissing a case such as this.  It is almost impossible to imagine a more detailed § 1983 complaint, and certainly the Plaintiffs have more than adequately set forth facts allowing an inference of a tainted grand jury proceeding, exactly as recently prescribed by the Fifth Circuit in *Curtis v. Sowell*.[54]  It is clear that the City and County are attempting to erect a wall rendering it impossible for *any plaintiff* to overcome a grand jury indictment in a false arrest

---

[49] *Id.* at 798.
[50] *Id.* at 799.
[51] *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993); *Hampton Nat'l Surety v. Tunica County Miss.*, 543 F.3d 2221, 226–27 (5th Cir. 2008).
[52] County Ds.' Reply at 7 and n.38; City Ds.' Reply at 5, 9.
[53] City Ds.' Reply at 6.
[54] *Curtis v. Sowell*, 2019 U.S. App. LEXIS 4666 *4–5 (5th Cir. Feb. 15, 2019).

case.  To ask a plaintiff to precisely state at the pleading stage exactly what transpired at a secret grand jury proceeding would be to effectively eliminate *any* false arrest claim in which there was an indictment, no matter how flawed.  Regardless of the standard applied, the Plaintiffs in this case have alleged in extreme detail the manner in which the grand jury was misled and how the individual Defendants contributed to that deception.

To support its position, The County cites two cases discussing absolute prosecutorial immunity that have nothing to do with the independent intermediary doctrine.[55]  Likewise, the City cites two cases—*Shaw v. Villanueva* and *Hand v. Gary*—that never examined the question of whether personal involvement was required.[56]  Another case cited by the City, *Scott v. White*, is inapplicable.  Most importantly, *it does not involve a grand jury indictment.*  At issue in *Scott* is an arrest warrant; despite using terminology from the independent intermediary doctrine, Judge Pitman actually applies traditional *Franks* analysis, to the surprise of no one.  Scott (a *pro se* plaintiff) originally only alleged that a second officer made the misrepresentations, and not White.[57]  In other words, under a *Franks* analysis, Scott's faulty allegations would not have stated a claim against White.  After an amended pleading and a second opinion, Judge Pitman dismissed the false arrest claim again, but on the grounds that the misrepresentations were not material to the arrest.[58]  In short, although it is discussed as the "independent intermediary doctrine," Judge Pitman simply applied traditional *Franks* analysis at every stage.  In short, the City has found a case that, on its face, uses independent intermediary language, but really had nothing to do with the analysis at issue here—whether a grand jury was misled by the use of tainted evidence.  Based

---

[55] County Ds.' Reply at 7 n.38.
[56] City Ds.' Reply at 5.
[57] *Scott v. White*, U.S. Dist. LEXIS 73907 *11 (W. D. Tex. Apr. 30, 2018).
[58] *Scott v. White*, U.S. Dist. LEXIS 2324 *10–11 (W.D. Tex. Jan. 7, 2019).

on one inapplicable case and snippets of text taken out of context, the City asks the Court to bypass established Fifth Circuit precedent.

The City's argument that each defendant must have had a malicious motive in tainting the grand jury fails for the same reasons.  Not a single case in the Fifth Circuit has applied such a rule when assessing the issue of whether a plaintiff's false arrest claim is extinguished by a subsequent grand jury indictment.  The plaintiff in *Winfrey v. Rogers* survived summary judgment (requiring a significantly greater level of proof than a 12(b)(6) analysis) on this precise issue, without any analysis of malice or the lack thereof.[59]  Furthermore, this requirement would lead to the same impossible situation in which a plaintiff must know not only precisely what transpired at a secret grand jury proceeding, but also the subjective intent of each individual defendant, a task that is inconceivable at the pleading stage.  Regardless, even when applying the standard suggested by the City, the extent to which Plaintiffs have plead that Defendants misled the jury and withheld facts clearly allows an inference of malice to be drawn.

## 2.     Plaintiffs have easily pleaded a plausible claim under any standard.

Plaintiffs have pleaded numerous facts from which it may be plausibly inferred that the grand jury was not presented "all the facts" or was "otherwise misled" (see the section "Grand Jury Deliberations Were Tainted" in Plaintiffs' live Complaint).  When looking at this exact issue, the Fifth Circuit has recently confirmed in *Curtis v. Sowell* the rule that "mere allegations" "may be adequate to survive a motion to dismiss where the complaint alleges other facts supporting the inference."[60]  "An inference supported by facts" is perfectly consistent with *Iqbal/Twombly*.  It is obvious that the court in *Curtis* and other Fifth Circuit cases—unlike the City and County

---

[59] *Winfrey v. Rogers*, 901 F.3d 483, 496–97 (5th Cir. 2018).
[60] *Curtis v. Sowell*, 2019 U.S. App. LEXIS 4666 *4–5 (5th Cir. Feb. 15, 2019) (citing *McLin v. Ard*, 866 F.3d 682, 690 (5th Cir. 2017)).

Defendants—recognized the impossibility of pleading specifically what transpired during a secret grand jury proceeding, and thus, "mere allegations" "may be adequate to survive a motion to dismiss where the complaint alleges other facts supporting the inference."  In fact, it is quite clear from a review of relevant Fifth Circuit case law that plaintiffs who have lost on this issue have done so because they completely fail to allege *any* facts that the grand jury was misled; in each of the cases cited by the City, the plaintiffs ultimately lost for that reason.  *See Curtis v. Sowell*, ("Curtis **does not allege** that the Appellees deceived the grand jury or withheld material information from it");[61] *Frank v. City of Ville Platte* ("[Plaintiff] **failed to include any factual allegations** regarding the withholding of information at the probable cause hearing").[62]

### 3.  Someone else's examining trial does not invoke the independent intermediary doctrine.

The County continues to pursue the patently frivolous argument that a finding of probable cause in an examining trial in an entirely different case bars these Plaintiffs from asserting a false arrest claim.[63]  Although addressed in Plaintiffs' Response, the County tries to re-frame the argument in their Reply by suggesting that the Plaintiffs have conceded the relevance of testimony from that examining trial, and therefore, the specific findings as to those criminal defendants are somehow transferable to Plaintiffs.  Beyond the fact that the transcript from that examining trial (which the County attempts to attach as extrinsic evidence) demonstrates the blatant misrepresentations and omissions made to the magistrate by law enforcement, there is absolutely no case law that would support stretching the independent intermediary doctrine to such lengths.

---

[61] *Curtis v. Sowell*, 2019 U.S. App. LEXIS 4666 *5 (5th Cir. Feb. 15, 2019) (emphasis added).
[62] *Frank v. City of Ville Platte*, 2019 U.S. Dist. LEXIS 36048 *22 (W.D. La. March 5, 2019) (emphasis added).
[63] County Ds.' Reply at 6 and n.30.

**E.    An outside proceeding, the details of which are unknown to this court, cannot establish probable cause as it pertains to these Plaintiffs.**

The City Defendants refer several times to *Ex parte Pilkington*, a case in which one of the motorcyclists arrested at Twin Peaks filed a writ of habeas corpus challenging a magistrate's finding of probable cause to hold him.[64]  *Pilkington*, however, is inapplicable for several reasons. Most obviously, it concerns a single individual who is not part of this lawsuit.  Whatever facts the court considered pertaining particularly to Pilkington do not apply to Plaintiffs.

Furthermore, it is certainly not clear from the opinion what "facts" the McLennan County DA's office submitted to the court, but they were almost certainly <u>not</u> the facts as alleged by Plaintiffs in this case. In fact, since Reyna was an attorney of record, it is inconceivable that he did not mislead the *Pilkington* court in precisely the same manner that he misled the public, the press, and the grand jury.  It is abundantly clear that the court fell for the fictional narrative advanced by law enforcement, even citing as fact that Pilkington was a member of a criminal street gang and that the police were fired upon—allegations Plaintiffs dispute, and certainly did not allege.[65]

Finally, contrary to the City's contention, *Pilkington* is hardly germane to the case at hand since the court admits to applying a "highly deferential standard" of review to the magistrate's determination of probable cause, even emphasizing this deferential standard in reaching its conclusion.[66]  Such a standard is certainly not applicable to a § 1983 case and is far short of a true independent finding of probable cause, as alleged by the City.

## VI.    *Monell* Liability

The County's Reply does little more than regurgitate the argument it previously advanced

---

[64] City Ds.' Reply at 12–13, 19–21, 24.

[65] *Ex parte Pilkington*, 494 S.W.3d 330, 337–38 (Tex. Crim. App.—Waco 2015, rehearing dismissed).

[66] *Pilkington*, 494 S.W.3d at 334.

in its Motion to Dismiss (namely, that Reyna was not the final policymaker). For the reasons set forth in Plaintiffs' Response, this argument is without merit. Plaintiffs have certainly made a plausible claim that Reyna was in fact the final policymaker as it relates to his actions as the elected District Attorney. The County does suggest that if Reyna was acting in his role as District Attorney, he was a representative of the State of Texas, rather than McLennan County.[67] This is incorrect. A prosecutor "primarily has attributes of a county officer," but represents the State "in all criminal cases in the district courts of his district and in appeals therefrom."[68] Here, Reyna was not representing the State in court; he was usurping a local investigation. As such, he was clearly acting on behalf of McLennan County and not the State of Texas.

Although the City also repeats many of the arguments from its Motion to Dismiss, they attempt in their Reply to direct the Court away from Plaintiffs' clearly pleaded theory of liability pursuant to the Supreme Court's holding in *Pembaur*.

**A.     *Pembaur* liability versus "single incident" liability under *Brown v. Bryan County*: completely distinct concepts.**

The City Defendants double-down in their attempt to conflate two different types of claims regarding municipal liability. In the end, the origin and usage of the phrase "single incident exception" does not matter, except insofar as it can lead to confusion. What *does* matter is that there is a clear divide between cases like *Pembaur* itself, in which a policymaker is alleged to have *personally and directly* violated the rights of a plaintiff,[69] and cases like *Brown v. Bryan County*,

---

[67] County Ds.' Reply at 23.

[68] *Esteves v. Brock*, 106 F.3d 674, 677–78 (5th Cir. 1997) (citing TEX. CONST. ART. V, § 21).

[69] *Pembaur v. City of Cincinnati*, 475 U.S. 469, 484 (1986) ("The Prosecutor made a considered decision based on his understanding of the law and commanded the officers forcibly to enter petitioner's clinic.").

which assert *Monell* liability based on the actions of *non-policymaker employees*, frequently in the form of a failure-to-train claim.[70]

      In something of a failed payoff of all this conflation, the City argues that Plaintiffs must plead (and have failed to plead) that Stroman's conduct was both deliberately indifferent to Plaintiffs' rights and a moving force behind their violation.[71]  Neither of these requirements appear in any true *Pembaur*-type case in the Fifth Circuit.  Further, it would be a superfluous requirement because a knowing, intentional, direct violation of rights (such as ordering the arrest of more than 100 people without probable cause) obviously satisfies any requirement for "moving force causation," and surpasses deliberate indifference.  One of the City's own cases (*Briseno v. County of El Paso*) makes this point: the court noted that "moving force causation" is satisfied when "the policymaker specifically directed the action resulting in the deprivation of petitioner's rights."[72]

**B.**    **The cases advanced by the City Defendants against *Pembaur* liability are few and unpersuasive.**

      The City cites *Doerr v. Sisson* as a comparator case, but the conduct of the Sheriff in *Doerr* was completely unlike the conduct of Chief Stroman in this case.  In *Doerr*, which is further distinguishable because it was a summary judgment case, the record developed by discovery showed that the Sheriff only gave "instructions to Deputy West to determine whether the Sissons

---

[70] *Brown v. Bryan County*, 219 F.3d 450, 452–53 (5th Cir. 2000) ("The question is whether Bryan County can be held liable under *Monell* . . . because the County failed to train Burns.").

[71] The City attempts more semantic contortions in their Reply, suggesting that "ordering arrests" somehow differs functionally from "approving the submission of arrest warrants."   Not only did Plaintiffs allege that "Stroman . . . ordered the arrests of Plaintiffs," the County cited testimony by Stroman in which he himself takes responsibility for the decision to arrest. Moreover, the City's contention is a distinction without a difference; had Stroman not approved Reyna's harebrained scheme, in the face of disagreement from his Assistant Chiefs, we would not be here today.  City Ds.' Reply at 10.

[72] *Briseno v. County of El Paso*, 2011 U.S. Dist. LEXIS 113189 *24 n.13 (W.D. Tex. Sep. 30, 2011).

wanted to press charges, and, if so, to obtain an affidavit from the Sissons."[73]   Moreover, the warrant challenged by Doerr clearly established probable cause, and there was "nothing in the record to indicate the Department should have known definitely that Sisson lied."[74]   Here, no record has been developed at all, and as Plaintiffs have alleged, Stroman has admitted that he ordered the arrests.  Because he was not aware of facts that would support probable cause to arrest each Plaintiff, he was deliberately indifferent to their rights in ordering their arrests.  Nothing in *Doerr* suggests that Stroman couldn't plausibly bind the City for his unconstitutional act.

Another case relied on by the City, *Ratliff v. City of Houston* (also unpublished), is clearly a *Brown*-type case, in which non-policymaker police employees acted outside the bounds of a department policy and arrested spectators at an illegal street race without probable cause.[75]   In the City's final case, *Briseno v. County of El Paso*, a plaintiff's *Pembaur* claim was dismissed because the allegations of policymaker involvement were only vague suggestions of *respondeat superior* and included <u>no facts</u> showing direct violation of the plaintiff's rights.[76]   Finally, it is worth noting that the City does not challenge the assertion that Stroman is a final policymaker.

**C.     Continuing detention.**

The Defendants fail to respond to Plaintiffs' claim of unlawful continued restrictions on their liberty in any meaningful way; the County says that this is simply a description of damages, and the City makes the conclusory statement that the claim "has no basis in law" while admitting it does not comprehend it.[77]   The idea is simple: it is an alternative pleading that *even if* the court

---

[73] *Doerr v. Sisson*, 563 Fed. Appx. 291, 294 (5th Cir. 2014).

[74] *Id.* at 293–94 and n.2.

[75] *Ratliff v. City of Houston*, 2005 U.S. Dist. LEXIS 39410 *94 (S.D. Tex. July 25, 2005).

[76] *Briseno v. County of El Paso*, 2011 U.S. Dist. LEXIS 113189 *24 and n.13 (W.D. Tex. Sep. 30, 2011).

[77] County Ds.' Reply at 22; City Ds.' Reply at 13–14.

finds that probable cause existed at the moment of Plaintiffs' arrests, there was still a violation when they continued be charged with a crime despite ever-mounting certainty that probable cause did not exist.  This issue was discussed at length in Plaintiffs' Response.

## VII.   The DPS Defendants Understate Their Role in Plaintiffs' Arrests

Schwartz and Frost make related arguments that (a) they are "precluded" from liability because Plaintiffs' own pleadings show that Reyna and Stroman were a "superseding cause," and (b) that they cannot be liable under a bystander theory because they had no authority to affect the outcome of what happened.[78]   Plaintiffs pleaded that Schwartz and Frost were a primary source of gang-related information at Twin Peaks, and it is certainly plausible that they were a moving force behind the decision to classify Plaintiffs as criminal street gang members.

Regarding bystander liability, Schwartz and Frost had a reasonable opportunity to prevent Plaintiffs' false arrest by simply explaining to Reyna and the Waco PD the *truth*, i.e., that Plaintiffs were *not* members of a criminal street gang, nor could they be found to belong to one under Chapter 71 without any evidence of their regular participation in criminal activities.  Had they done so, the arrest of nearly 200 people would have been stopped in its tracks.

## VIII.   The DPS Defendants and *Malley*

Plaintiffs agree that Frost and Schwartz have accurately described the law regarding who can be liable for a *Malley* violation.[79]   However, unless the Court decides at this early stage that, as a matter of law, this *is* a *Malley* case, then Plaintiffs have pleaded plausible causes of action against Frost and Schwartz under *Franks*.  Regardless, Plaintiffs have pleaded sufficient facts to allege bystander liability and conspiracy, as well.

---

[78] DPS Ds.' Reply at 16–18, 19–22.
[79] *See* DPS Ds.' Reply at 6.

IX. ***Franks* Was Clearly Established in 2015**

The DPS Defendants incorrectly accuse Plaintiffs of misconstruing their argument about the state of *Franks* law in the Fifth Circuit in 2015.[80]   That *Franks* was "temporarily un-established" as to a person who was not either the affiant or fully involved in the preparation of the affidavit is *exactly* what they are arguing.  Schwartz and Frost admit in their original Response that *Hart v. O'Brien* established *Franks* liability in the Fifth Circuit for someone who "deliberately or recklessly provides false, material information for use in an affidavit in support of a search warrant, regardless of whether he signs the affidavit."[81]   They also admit that after *Melton* was decided in 2017, "an officer who intentionally or recklessly provides false information for use in a probable cause affidavit 'may be liable for Fourth Amendment violations under Franks even though he neither signed nor drafted the affidavit.'"[82]   So to argue that *Hampton* and/or *Jennings* somehow muddied the waters between 2007 and 2017 can be nothing but an argument that it was "temporarily un-established," at least as regards someone who did not sign the warrant or was fully involved in its preparation.

Beyond that, they do nothing more than restate their initial argument, which Plaintiffs have already addressed in their Response.

X. **Plaintiffs Have Pleaded a Rich Factual Narrative from Which to Infer a Conspiracy.**

The City Defendants do not respond to Plaintiffs' conspiracy claim in their Reply.   The County and DPS Defendants' arguments generally consist of broad statements that the allegations are "conclusory" and "speculative," or that Plaintiffs cannot precisely identify who was at the meetings held by Reyna.[83]   As noted in their Response, Plaintiffs have clearly pled that all of the

---

[80] DPS Ds.' Reply at 18.
[81] DPS Motion to Dismiss at 12–13.
[82] DPS Motion to Dismiss at 16.
[83] County Ds.' Reply at 22; DPS Ds.' Reply at 12.

individual Defendants were communicating with each other throughout the day about key information that went into the decision to arrest; that Reyna and Stroman discussed the decision to arrest over the phone; and that major decisions regarding the arrests were made in meetings attended by *at least* Reyna and Lanning.  Plaintiffs allege that testimony by Lanning, Schwartz, Chavez and others gives insight into how the decision was made and agreed or acquiesced to.  Such evidence is more than sufficient at the pleading stage to state a plausible conspiracy claim.[84] [85]

## XI.   Opportunity to Replead

If this Court believes it is necessary, Plaintiffs can certainly amend their pleadings to add *even more* facts that would support their claims.  For example, (a) their *exact* location at the time of the shooting (to further demonstrate that they were not engaging in any acts related to the violence that undisputedly occurred); or (b) the *exact* items of clothing that they were wearing (to further demonstrate the flimsy, conclusory nature of Defendants' assertions that they were "wearing common identifying distinctive signs or symbols."  Similarly, if this Court believes that additional clarity is necessary to demonstrate that already-pleaded facts also give rise to bystander and supervisory liability, or continued detention, Plaintiffs can easily do so. In sum, for the reasons stated in their Response, if this Court believes that such refinements are necessary, Plaintiffs have *not* pleaded their "best case," and are entitled to an opportunity to replead.

---

[84] Incidentally, this is immeasurably more evidence of a common plan and an agreement than law enforcement had regarding Plaintiffs' alleged conspiracy to commit murder at Twin Peaks.

[85] Along similar lines, Schwartz and Frost repeat throughout their reply that Plaintiffs' Response focuses on a "common core" of allegations and does not specifically address them.  It should not have to be explained, however, that the phrase was only included to explain the organization of an omnibus response that attempted to minimize repetition.

Respectfully submitted,

By:  /s/ Don Tittle
         Don Tittle
         State Bar No. 20080200
         don@dontittlelaw.com
         Roger Topham
         State Bar No. 24100557
         roger@dontittlelaw.com
LAW OFFICES OF DON TITTLE, PLLC
6301 Gaston Avenue, Suite 440
Dallas, Texas  75214
214/522-8400
214/389-1002 – Fax
*LEAD COUNSEL FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of June, 2019, I electronically submitted the foregoing document with the Clerk of Court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court, and that a true and correct copy of the foregoing has been served upon all counsel of record, by electronic service via the Court's CM/ECF system.

         /s/ Don Tittle
         Don Tittle